(SC 20982)

McDonald, D'Auria, Mullins, Ecker, Alexander,
Dannehy and Cradle, Js.**

*Syllabus*

The defendant, R, appealed, and the intervenor, B, cross appealed, from the trial court's judgment dissolving R's marriage to the plaintiff, K, and from various of the court's related orders. R and B claimed, inter alia, that the trial court had improperly failed to afford full faith and credit to a New Jersey court judgment and related orders that had been previously rendered in favor of B, and against R, among others, in the amount of approximately $24.7 million. R also challenged the trial court's finding that he had dissipated the marital estate by pledging the marital home and certain investment accounts as security, and by later forfeiting them, in connection with the New Jersey litigation. B claimed, inter alia, that the trial court had erred in finding that the marital home and investment accounts were assets of the marital estate. *Held*:

The issue of whether the trial court improperly found that R had dissipated marital assets by pledging the marital home as security in connection with

---

 * In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

 ** The listing of justices reflects their seniority status on this court as of the date of oral argument.

K. S. *v.* R. S.

the New Jersey litigation was not moot because, although R did not contest certain of the court's other findings of dissipation, this court could still afford R relief if it were to reject the trial court's finding that he had dissipated the marital home.

The trial court correctly determined that R had dissipated the marital estate by pledging the marital home as security in connection with the New Jersey litigation and then forfeiting it, as the trial court properly found that the elements of dissipation had been satisfied.

The trial court, in distributing the marital estate, erred in failing to afford full faith and credit to the judgment and orders rendered in connection with the New Jersey litigation, as the New Jersey court orders forfeiting the marital home and imposing a constructive trust on the investment accounts to secure enforcement of the $24.7 million New Jersey judgment were final orders of the New Jersey court, the New Jersey court had personal jurisdiction over R, who willingly pledged the property as security, and a public policy rationale was not a proper basis for declining to give full faith and credit to the New Jersey judgment and orders.

The trial court erred in concluding that the marital home and the investment accounts were assets of the marital estate that were subject to equitable distribution, as the court was required to give full faith and credit to the New Jersey court's orders, which removed those assets from the marital estate prior to the trial court's judgment in the present case, and, accordingly, those assets were not subject to equitable distribution.

The trial court, in fashioning its financial orders, did not abuse its discretion by failing to value and account for the $24.7 million liability that R had incurred in connection with the New Jersey litigation, because, under the statute (§ 46b-81) governing the assignment of property and transfer of title in instances of divorce or annulment, the court was not required to value R's liability but, rather, to more generally consider the liabilities of the parties in its equitable division of the marital estate.

The trial court's determination with respect to the amount of R's annual earning capacity was not clearly erroneous, as the court properly considered evidence of R's past income, education and vocational skills, and R failed to submit his own evidence to establish his earning capacity.

The trial court erred by calculating R's share of child support on the basis of R's earning capacity without first identifying the presumptive amount of child support under the child support guidelines based on R's actual income, as the trial court was required to first make a finding of the presumptive amount of child support based on R's actual income, and, if it found that the presumptive amount would be inequitable or inappropriate, it could then apply a specific deviation criterion to order a different amount.

694            DECEMBER, 2024      350 Conn. 692

K. S. *v.* R. S.

The trial court did not abuse its discretion in finding that K should be allowed to relocate with the party's children to another country, as the court properly applied the best interests of the child standard and was clearly guided by the factors set forth in the applicable statutes (§§ 46b-56 (c) and 46b-56d (b)) in considering the evidence presented.

The trial court abused its discretion in granting K's pendente lite contempt motion for R's alleged failure to support K and their children throughout the pendency of the dissolution action, the court having failed to make an explicit finding that R had wilfully violated any of its automatic orders, and K having failed to identify any clear and unambiguous order requiring R to provide certain other support that he allegedly withheld.

B could not prevail on his claim that the prejudgment remedy order entered in favor of K that attached certain of the parties' marital assets constituted a fraudulent transfer of assets in which B had an ownership interest, as there was evidence in the record to support the court's finding that K and R had not colluded by entering into a sham divorce proceeding in an effort to shield assets from B.

The trial court's erroneous financial orders were so intertwined with its other financial orders that it was necessary to remand the case for the trial court to conduct a hearing on all financial issues, including the division of the marital assets, giving full faith and credit to the New Jersey court judgment and orders.

Argued March 21—officially released November 13, 2024***

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *Heller, J.*, granted the motion to intervene filed by Robert S.; thereafter, the intervenor filed a complaint; subsequently, the case was tried to the court, *Hon. Michael E. Shay*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment dissolving the marriage and granting certain other relief, from which the defendant appealed and the intervenor cross appealed. *Reversed in part*; *further proceedings*.

*Scott T. Garosshen*, with whom was *Linda L. Morkan*, for the appellant (defendant).

*** November 13, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

K. S. *v.* R. S.

*John R. Weikart*, with whom was *James P. Sexton*, for the appellee-cross appellee (plaintiff).

*Matthew J. Letten*, with whom was *Richard P. Colbert*, for the cross appellant (intervenor).

*Opinion*

McDONALD, J. This case comes to us on appeal from the trial court's judgment in a complex marital dissolution action. The case concerns, among other issues common to divorce proceedings such as custody and child support, the authority of a trial court in Connecticut to decline to give full faith and credit to the judgments and court orders of another state that impact the marital estate. We conclude that the trial court was required to give full faith and credit to the orders of the other state. Accordingly, we affirm in part and reverse in part the judgment of the trial court.

The defendant ex-husband, R. S., emigrated from Slovakia with his family when he was a teenager and is a citizen of both the United States and Slovakia. The plaintiff ex-wife, K. S., grew up traveling between countries, depending on her father's diplomatic post, and is a citizen of the Czech Republic. The couple was married in New Jersey in 2008 and held marriage ceremonies in both New Jersey and the Czech Republic. They have two children, who are dual citizens of the United States and the Czech Republic. The children have resided in the United States for almost their entire lives and, at the time of the trial court's decision, were enrolled in the Greenwich public school system.

The defendant holds a Bachelor of Science degree in mathematics, with a minor in chemistry, from Rutgers University. He spent the bulk of his career employed in the family business, Koger, Inc. (Koger), an administrative software company started and owned by his father. He began his career in customer support, then

K. S. *v.* R. S.

transitioned to sales and marketing, and, after about six years at Koger, was named chief operating officer (COO). The defendant's father held 97 percent ownership of Koger, and the defendant and his brother, an intervenor in this case, each held 1.5 percent. Additionally, there were several entities under the parent company of Koger, including two holding companies, Koger Distributed Solutions, Inc. (KDS), and Koger Professional Services, Inc. (KPS), of which the defendant and the intervenor each owned 50 percent. The defendant formally received a base salary of $36,000 from Koger for most of his time there, but, from 2000 to 2006, the defendant's father split the profits between himself and his sons, with the defendant and the intervenor each receiving roughly 25 percent. By 2014, the defendant received total compensation of roughly $3.3 million for that year.

Relevant to the Connecticut divorce proceeding, in 2007, the intervenor brought an action in New Jersey against family owned companies, his father and the defendant, seeking to take control of Koger. While that litigation was ongoing, the plaintiff filed for divorce in March, 2017. The plaintiff cited the ongoing litigation in New Jersey, discussed subsequently in this opinion, as a primary reason for the breakdown of the marriage. The plaintiff also noted the defendant's lack of respect for her as a person, citing instances of humiliation and controlling and argumentative behavior, as contributing to the breakdown of the marriage. The plaintiff sought an equitable division of assets and approval from the trial court to relocate with their children to the Czech Republic. In 2018, the intervenor was granted intervenor status in the marital dissolution action in order to protect his interests, by virtue of the New Jersey litigation, in certain assets at issue.

The principal marital asset was the couple's home in Greenwich (Greenwich property), which was purchased

K. S. *v.* R. S.

for $5.6 million in 2015 and, at the time of the dissolution judgment, had an estimated value of about $11 million. The Greenwich property was purchased by a limited liability company of which the defendant was the sole member. Nevertheless, the trial court granted the plaintiff a prejudgment remedy (PJR) attachment of the Greenwich property in May, 2017. The couple also had several investment accounts that had a combined total value of about $4.6 million, less a $3 million transfer to Slovakia by the defendant, discussed later in this opinion, all frozen due to the PJR attachment and a judgment resulting from the New Jersey litigation. The plaintiff and the defendant also have modest retirement accounts, share an interest in a home in the Czech Republic, and shared a condominium in New Jersey that was sold in 2021, and the proceeds were split between the plaintiff and the intervenor.

Intertwined with the marital dissolution action on appeal to this court is the ongoing litigation that began in New Jersey in 2007. The intervenor brought an action against his father, the defendant, Koger, KDS, KPS, and one other entity, seeking to take control of Koger and ultimately dissolve it. The intervenor claimed that he had been forced out of the family business and deprived of his financial interests in the process. That case led to a judgment from the Chancery Division of the Superior Court of New Jersey (New Jersey trial court) in favor of the intervenor. The New Jersey trial court found that the intervenor was not an oppressed shareholder because he had voluntarily resigned from his position, surrendered his interests in KPS and KDS, and consequently retained only his 1.5 percent interest in Koger. The parties appealed from the decision of the trial court, and, on appeal, the Appellate Division of the Superior Court of New Jersey (New Jersey Appellate Division) largely upheld the New Jersey trial court's decision but determined that, although the intervenor had lost his

K. S. *v.* R. S.

1.5 percent interest in Koger, he had retained his 50 percent interests in KPS and KDS. Subsequently, the matter was appealed to the New Jersey Supreme Court, which reversed in part the judgment of the New Jersey Appellate Division, concluding that the intervenor had retained all of his interests in Koger, KPS, and KDS, and the matter was remanded to the New Jersey trial court for further proceedings. On remand, the New Jersey trial court rendered judgment for the intervenor, and against the defendant, the father, and the family business, in the amount of approximately $24.7 million. Before judgment was rendered in the New Jersey action in 2016, however, the defendant and his father wired a total of approximately $19.792 million to Slovakia, of which the defendant contributed about $3 million.

In order to appeal from the judgment of the New Jersey trial court, the defendant and his father were required to post an appeal bond of $24.7 million. They requested that they be allowed to post the following assets in lieu of a bond: the defendant's 1.5 percent share in Koger, his father's 97 percent share in Koger, $3 million in cash from Koger, and the Greenwich property, which was then valued at $6.75 million. The New Jersey trial court allowed the defendant and his father to post these assets, but, upon learning subsequently that they had improperly failed to disclose properties in Slovakia and had transferred more than $19.792 million to Slovakia, that court declared the posted assets forfeited and ordered the defendant and his father to return the money that was transferred abroad.

After failing, or refusing, to return the funds sent to Slovakia, the defendant's father fled the United States, and the defendant was found in contempt and incarcerated on weekends,[1] pending compliance with the orders

---

[1] The defendant was incarcerated on almost every weekend from July, 2018, through the beginning of March, 2020. He was not incarcerated during a couple of weekends in that period due to a health concern. The defendant was then incarcerated on a full-time basis, beginning on March 6, 2020, but

K. S. *v.* R. S.

of the New Jersey trial court. That court also imposed a constructive trust on the defendant's assets to secure enforcement of the $24.7 million judgment and appointed a special fiscal agent (SFA) to manage Koger. To ensure that part of the judgment was satisfied, the New Jersey trial court ordered the transfer of the Greenwich property, which was forfeited by the defendant, and ordered the defendant to turnover the funds in his investment accounts by virtue of the constructive trust. The SFA also began distributing most of Koger's profits to the intervenor and reduced the defendant's annual compensation to between $420,000 and $600,000. Ultimately, the SFA terminated the defendant's employment with Koger in 2018, and the SFA sold Koger in 2021. After the defendant was discharged from Koger, he did not attempt to secure employment and instead focused his efforts on trying to arrange financing to cover the judgment and arrange a buyout of Koger so that he could return to his position as COO. In 2020, the New Jersey Appellate Division reversed in part the $24.7 million judgment and remanded the case to the New Jersey trial court to reassess the damages after a marketability discount. The intervenor appealed from the New Jersey Appellate Division's judgment, and the appeal was still pending on May 5, 2022, when the Connecticut trial court rendered the judgment of dissolution in the present action.

In March, 2020, while the defendant was incarcerated full-time; see footnote 1 of this opinion; the plaintiff took the children to the Czech Republic without the defendant's consent. An international court ordered the plaintiff to return with the children to the United States. The Connecticut trial court found that there was some evidence that her absconding to the Czech Republic was "a well orchestrated event." Despite this, during

was temporarily released on March 23, 2020, due to the COVID-19 pandemic. He was subsequently ordered to return to jail on a full-time basis, beginning on April 1, 2022.

K. S. *v.* R. S.

trial, the family relations counselor, whom the trial court found to be credible and compelling, testified that "it was in the best interests of the minor children for the [plaintiff] to relocate with the children to the Czech Republic."

In crafting its memorandum of decision, the Connecticut trial court distilled the various issues raised throughout the course of the litigation and considered the following three questions: "(1) Do married persons acquire any rights in the property of the other spouse by virtue of marriage? If so, what is the nature of those rights, and when do such rights attach? (2) Does a spouse have a duty to preserve the marital estate? If so, is a spouse obligated to take steps to recover marital property that was dissipated or wrongfully transferred in bad faith? (3) Must a court enforce a valid foreign judgment that lacks finality as to the amount, without regard to public policy considerations, and without [providing the parties] an opportunity to raise any valid defenses, such as lack of personal or subject matter jurisdiction, or fraud?"

In considering the first question, the Connecticut trial court concluded that "each spouse ha[d] an inchoate interest in the entirety of the marital estate, commencing with the date of the marriage . . . ." (Footnote omitted.) In considering the second question, the court, citing to *Gershman* v. *Gershman*, 286 Conn. 341, 351, 943 A.2d 1091 (2008), observed that a spouse has an obligation not to waste or dissipate the marital estate. The court, citing to *Finan* v. *Finan*, 287 Conn. 491, 499, 949 A.2d 468 (2008), also determined that, for purposes of the dissipation analysis, "it does not matter if the dissipation occur[s] before or after the filing of the complaint [for the dissolution of the marriage]." Further, the court concluded that it was "clear" that, by pledging marital assets to secure the New Jersey judgment, the defendant "breached his duty to preserve the

K. S. *v.* R. S.

marital estate.'' The trial court then went on to discuss the remedy available in a case of dissipation and pointed to *Ferri* v. *Powell-Ferri*, 317 Conn. 223, 116 A.3d 297 (2015), for the proposition that a court may recognize a new cause of action ''if the judicial sanctions available are so ineffective as to warrant the recognition . . . .'' (Internal quotation marks omitted.) Id., 229. The trial court also pointed to cases of fraudulent conveyance, in which ''the court has the power to void the transfer and recoup the assets . . . .'' See, e.g., *Molitor* v. *Molitor*, 184 Conn. 530, 535–36, 440 A.2d 215 (1981). The trial court then concluded that, although there were other ''available remedies . . . [in the absence of] the right to recoup the pledged assets, they [were] effectively toothless and [left] the court with no way to either restore the marital estate or [to] offset the loss in any equitable division because . . . the entire estate had been dissipated!'' (Emphasis omitted.)

The Connecticut trial court then turned to the final question. It clarified that the validity of the New Jersey judgment was not disputed and that, instead, the issue before the court was whether it must give such a judgment full faith and credit. In concluding that it need not give full faith and credit to the New Jersey judgment, the court determined that (1) the intervenor did not hold a final monetary judgment because of the New Jersey Appellate Division's remand as to valuation and the likelihood that the New Jersey trial court would modify the judgment; (2) the New Jersey trial court lacked jurisdiction to directly transfer real property located in Connecticut; (3) ''the strong public policy for equitable distribution, and notions of equity, weigh[ed] heavily against the loss of the marital estate, having a value of more than \$14,000,000,[2] [which] far exceed[ed]

_____

[2] The trial court did not explicitly state how it calculated the estimated value of the marital estate. Presumably, the \$14 million amount was based on the estimated value of the Greenwich property and the investment and retirement accounts.

the claimed balance owed to [the intervenor], who would reap a windfall and defeat the right of the [defendant] and the [plaintiff] . . . to an equitable division of the marital estate''; (footnote added); and (4) "by enforcing the judgment, the [Connecticut trial] court would, in essence, hold the [plaintiff] liable for the debts of the [defendant] not incurred in support of the family.''

The Connecticut trial court issued several orders. Relevant to this appeal, the court ordered that the Greenwich property be sold, with the net proceeds divided as follows: "(a) 35 percent to [the plaintiff] outright, and (b) 65 percent ('remaining proceeds') to be held in firm escrow for the benefit of [the plaintiff], [the defendant], and [the intervenor], pending a final decision in the civil action . . . in the [New Jersey trial court], at which time the remaining proceeds set forth in part (b) herein shall be disbursed . . . first to [the intervenor] to satisfy the unpaid balance of the [New Jersey] judgment . . . and the remainder, if any, shall be divided as follows: the first \$1,500,000 to [the plaintiff], as an offset to the margin loan taken by the [defendant] during the pendency of the action and the subsequent transfer, and the balance, if any, to be divided equally by [the plaintiff] and [the defendant].'' (Emphasis omitted.) The Connecticut trial court also ordered that the plaintiff receive 35 percent of the remaining amount in the investment accounts. The other 65 percent would then be held in escrow and distributed first to the intervenor to satisfy the unpaid balance of the New Jersey judgment, and any remainder would be divided equally between the plaintiff and the defendant.

Additionally, other orders entered by the Connecticut trial court also are challenged in this appeal. Those orders, which will be discussed in greater detail subsequently in this opinion, include: the court found that the defendant had an annual earning capacity of \$400,000; the court determined that the defendant must pay the

K. S. *v.* R. S.

plaintiff child support in the amount of $749 per week, which it calculated using the defendant's earning capacity rather than his actual income; the court allowed for the possibility that the plaintiff could relocate with their children to the Czech Republic, despite the defendant's opposition to such a move; the court granted the plaintiff's motion for contempt, concluding that the defendant had failed to support his family throughout the pendency of the dissolution action; and the court denied the intervenor's fraudulent transfer claim, determining that the PJR attachment did not constitute a fraudulent transfer of assets in which the intervenor had an interest.

The defendant appealed and the intervenor cross appealed from the judgment and orders of the Connecticut trial court to the Appellate Court, claiming, among other things, that the court improperly had failed to afford full faith and credit to the judgment and orders of the New Jersey trial court. The appeals were subsequently transferred to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1A. On appeal, the plaintiff argues that one of the defendant's claims, which centers on the Connecticut trial court's finding of dissipation, is moot. The defendant contends that (1) his claim as to dissipation is not moot, and the Connecticut trial court incorrectly determined that the defendant's efforts to defend the marital assets against the intervenor's collection efforts constituted dissipation, (2) the court erred in finding that the defendant has a $400,000 annual earning capacity, (3) the court erred in granting the plaintiff's motion for contempt, (4) the court erred in failing to value and account for the New Jersey judgment, (5) the court erred in computing child support based on earning capacity in the first instance, and (6) the court erred in permitting the plaintiff to relocate with the children to the Czech Republic. Additionally, the intervenor claimed that the Connecticut trial court erred in (1) finding that the Greenwich

K. S. *v.* R. S.

property and the investment accounts were assets of the marital estate, (2) failing to afford the New Jersey judgment and postjudgment orders full faith and credit, and (3) finding against the intervenor on his fraudulent transfer claims. The defendant has supported the intervenor's position in connection with his cross appeal. Because of the interrelated nature of many of the issues raised on appeal and cross appeal, this opinion will address issues raised on appeal and cross appeal together to the extent that they are related. Additional facts and procedural history will be set forth as necessary.[3]

I

MOOTNESS AND DISSIPATION

Before we address the merits of the issue of mootness, an overview of the Connecticut trial court's findings is necessary to an understanding of the plaintiff's mootness claim. The court concluded that the defendant had dissipated marital assets by pledging the Greenwich property and the investment accounts as security in the New Jersey litigation. The court further found that the defendant's "wrongful and reckless pledge of the [Greenwich property], with no existing mortgage, as well as the investment accounts, placed the [plaintiff's] reasonable expectations in jeopardy." Further, the court stated that it was the defendant's "failure to abide by the orders of [the New Jersey trial] court" that "triggered the very default that is the subject of the intervenor's claim." The court found that the "pledge of marital assets by

---

[3] We are aware that, on May 2, 2024, the Connecticut trial court issued an order accepting joint stipulations from the plaintiff, the defendant, and the intervenor as to the release and distribution of some of the funds in the investment accounts at issue in this case. It is the understanding of this court, based on the representations made by the intervenor's counsel, that additional funds remain in the investment accounts and that their distribution will be contingent on the outcome of this court's decision. Nothing in this opinion should be read as impeding the distribution of funds that has been agreed on by the parties and accepted by the trial court.

K. S. *v.* R. S.

the [defendant] was clearly not related to the marriage but, rather, was solely related to his lawsuit in New Jersey.'' Finally, the court found that this misconduct had occurred when divorce was reasonably foreseeable because, ''based [on] the testimony of the parties themselves, the marriage ha[d] been in serious trouble or failing for many years.'' Therefore, the court concluded that the Greenwich property and the investment accounts had been dissipated.

## A

### Mootness

The allegedly dissipated assets included the Greenwich property, various investment accounts, which contained more than $1 million, and the approximately $3 million that the defendant had transferred to Slovakia. After he filed his appellate brief, however, the defendant submitted an errata letter to this court, deleting a paragraph from his brief that takes issue with the trial court's finding that his transfer of $3 million to Slovakia was misconduct. In the errata letter, the defendant explained that he no longer challenges the court's finding with respect to the $3 million transfer. Instead, the defendant clarified that he now ''challenges only the first dissipation finding, as to the asset pledge.''[4] In the letter, the

---

[4] We note that, as a result of the defendant's errata letter, it is not entirely clear to us whether the defendant is challenging only the trial court's finding with respect to the pledge of the Greenwich property or whether he is challenging the finding with respect to both the pledge of the Greenwich property and the investment accounts. Because the defendant, as the appellant, has the burden to adequately brief the issue such that we clearly understand the scope of the issue on appeal, we address only the trial court's finding as to the Greenwich property, which the defendant is unquestionably challenging. See, e.g., *Burton* v. *Dept. of Environmental Protection*, 337 Conn. 781, 803, 256 A.3d 655 (2021) (''[f]or a reviewing court to judiciously and efficiently . . . consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs'' (internal quotation marks omitted)); see also, e.g., *Birch* v. *Polaris Industries, Inc.*, 812 F.3d 1238, 1249 (10th Cir. 2015) (declining to review claim that was ''vague, confusing, [and] conclusory''). Ultimately, however, given our conclusion that the judgment of dissolution must be reversed with respect to

K. S. *v.* R. S.

defendant further asserted that, "[r]egardless of whether the overseas transfer formally counts as 'dissipation,' [he] does not contest the [trial] court's treatment of it, i.e., awarding the plaintiff $1.5 million as an offset."

The plaintiff contends that the revisions made to the defendant's brief through his errata letter render his claim regarding dissipation of assets moot because, "[e]ven if this court were to agree with the defendant on his remaining claim—that the trial court's finding that his pledge of marital assets in the New Jersey [litigation] constituted dissipation was erroneous— [this court] could [not] afford him any practical relief with regard to the trial court's ultimate finding of dissipation" insofar as "the defendant no longer challenges the other basis for that finding . . . ." The defendant, in response, argues that "[t]he trial court expressly segregated the $3 million overseas transfer from the other financial orders" and that "all conduct found to be dissipation must qualify as dissipation." (Emphasis omitted.) We agree with the defendant that the dissipation claim is not moot.

"Mootness implicates [this] court's subject matter jurisdiction and is thus a threshold matter for us to resolve. . . . An actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude [this] court from granting any practical relief through its disposition of the merits, a case has become moot." (Internal quotation marks omitted.) *Private Healthcare Systems, Inc.* v. *Torres*, 278 Conn. 291, 298–99, 898 A.2d 768 (2006). We have stated that, "when an appellant challenges a trial court's adverse ruling, but does not

the trial court's financial orders and that the case must be remanded for a new hearing as to those orders, the parties may raise arguments regarding any asset at that time.

K. S. *v.* R. S.

challenge all independent bases for that ruling, the appeal is moot.'' *State* v. *Lester*, 324 Conn. 519, 527, 153 A.3d 647 (2017).

The case law from this state's appellate courts requires a trial court to consider each instance of alleged dissipation separately for purposes of determining whether the value of the dissipated asset should be included in the marital estate for equitable division. See, e.g., *Finan* v. *Finan*, supra, 287 Conn. 507–508 (discussing dissipation in terms of specific ''transaction'' that occurred); see also, e.g., *Shaulson* v. *Shaulson*, 125 Conn. App. 734, 739, 742, 9 A.3d 782 (2010) (concluding that trial court's order, in which court found that husband had dissipated $150,000 to furnish his new home and credited that amount against husband in division of assets, was not improper), cert. denied, 300 Conn. 912, 13 A.3d 1102 (2011). This makes sense, of course, because the assets and value of the assets found to have been dissipated normally will be an essential component of the trial court's financial orders, and, for the same reason, the remedy on appeal for an erroneous finding of dissipation will depend on those same particulars. In other words, the fact that the defendant admits that he dissipated $3 million of the marital estate does not render moot his claim of error relating to the other $11 million that the trial court found he had dissipated.

We conclude that the defendant's claim regarding dissipation is not moot because this court must consider whether the defendant dissipated the Greenwich property and the investment accounts in order to determine whether the trial court equitably distributed the marital estate. Simply because the defendant no longer contests the trial court's finding and offset with respect to his $3 million overseas transfer does not mean that the court properly treated the Greenwich property as dissipated. We therefore agree with the defendant that his claim is not moot, as this court could still afford him practical

K. S. *v.* R. S.

relief if we were to reverse the trial court's finding that he had dissipated the Greenwich property.

B

Dissipation

Having concluded that the defendant's dissipation claim is not moot, we turn to the merits of that claim. The defendant argues that the trial court incorrectly determined that he had dissipated the marital estate by pledging the Greenwich property as security for his appeal in the New Jersey litigation and then forfeiting the pledged property. The defendant contends that posting and forfeiting the Greenwich property was not financial misconduct. He also argues that the pledging of assets was for a purpose relating to the marriage because he sought to resolve a source of tension in the marriage, and, although the trial court found that the marriage had been in jeopardy since 2014, he was not aware of this, and, therefore, the court's finding of dissipation was improper. For her part, the plaintiff contends that the defendant "takes too cramped a view of the dissipation issue by focusing solely on" his initial pledge of the Greenwich property. The plaintiff asserts that "a key finding" of the Connecticut trial court was that the defendant had failed to abide by the orders of the New Jersey trial court, which triggered the default that is the subject of this claim. The plaintiff also argues that there is no evidence to suggest that the defendant posted marital assets as a way to improve his marriage, and, thus, the defendant's claim to the contrary must fail. Further, the plaintiff argues that this court's case law requires only that the conduct dissipating the assets occurred while the marriage was in serious jeopardy but not that the defendant was aware of that fact. The plaintiff contends that, because the trial court found that the marriage was clearly in jeopardy at the time the

K. S. *v.* R. S.

defendant pledged the assets, that element of a dissipation claim is satisfied.

Our review of this claim is guided by our previous decision in *Gershman* v. *Gershman*, supra, 286 Conn. 341. In *Gershman*, as in the present case, we were faced with the question of "what, as a matter of law, constitutes dissipation in the context of a marital dissolution proceeding." Id., 346; see also *Shaulson* v. *Shaulson*, supra, 125 Conn. App. 740. Accordingly, our review of this claim is plenary. See *Gershman* v. *Gershman*, supra, 346. For a trial court to find that dissipation has occurred, the following elements must be present: (1) "financial misconduct involving marital assets, such as intentional waste or a selfish financial impropriety"; id., 351; (2) for "a purpose unrelated to the marriage"; id.; (3) which occurs either "in contemplation of divorce or separation," or "while the marriage is in serious jeopardy or is undergoing an irretrievable breakdown." *Finan* v. *Finan*, supra, 287 Conn. 493.

When a trial court makes a finding of dissipation, the court has the power to offset the value of the dissipated assets at the time that it equitably divides the estate. See, e.g., *O'Brien* v. *O'Brien*, 326 Conn. 81, 93, 161 A.3d 1236 (2017) (trial court can take into account, "when dividing the parties' assets, whether a party had engaged in a dissipation of those assets" (internal quotation marks omitted)); *Finan* v. *Finan*, supra, 287 Conn. 500–501 (trial courts have authority "to consider a spouse's dissipation of marital assets when determining the nature and value of property to be assigned to each respective spouse"); *Shaulson* v. *Shaulson*, supra, 125 Conn. App. 739, 742 (trial court properly charged $150,000 to husband's portion of divided marital assets after finding that he had improperly dissipated those funds).

We begin with the trial court's finding as to the first element of dissipation, namely, that there must be

K. S. *v.* R. S.

"financial misconduct involving marital assets, such as intentional waste or a selfish financial impropriety . . . ." *Gershman* v. *Gershman*, supra, 286 Conn. 351. As to this element, the Connecticut trial court explained that the defendant "pledged . . . very significant family assets as security in the New Jersey case . . . ." Importantly, the court concluded that the defendant's "failure to abide by the orders of [the New Jersey trial] court triggered the very default that is the subject of the intervenor's claim." We agree with the plaintiff that "the trial court's finding of dissipation was based on the defendant's entire course of action, from his initial pledge of marital assets, through his wilful nondisclosure of his transfer of millions of dollars overseas; that entire sequence of events resulted in the default in New Jersey that allowed the intervenor to move to seize virtually all of the defendant's assets . . . ."

As we noted in *Gershman*, case law from other jurisdictions reveals that "findings of financial misconduct are [fact-specific], and frequently turn on the motivation of the party charged with misconduct," and that "there must be some evidence of [wilful] misconduct, bad faith, intention to dissipate marital assets, or the like, before a court may alter the equitable distribution award for such misconduct." (Internal quotation marks omitted.) *Gershman* v. *Gershman*, supra, 286 Conn. 347; see also, e.g., 2 B. Turner, Equitable Distribution of Property (3d Ed. 2005) § 6:107, pp. 575–76 (harmful or selfish expenditure of marital assets undertaken for nonmarital purpose must be demonstrated before one spouse can be found to have dissipated marital assets).

The New Jersey trial court in the present case went so far as to state that the defendant and his father "wired [almost] $20 million cash from their . . . accounts [in the United States] to family members in Slovakia within days of learning of the $18 million . . . award [not including interest] against them at the end of July, 2016.

This astounding revelation establishes that [the defendant and his father] have not been transparent or forthright but rather have been obstructionist, and have failed to reveal their true financial circumstances, both as to their asset situation and their ability to post a cash or surety bond." In short, while claiming that they did not have sufficient funds to post the appeal bond in New Jersey, the defendant and his father wired nearly $20 million to Slovakia after learning of the judgment against them. The defendant was even incarcerated in New Jersey on a full-time basis for civil contempt arising from his failure to return the millions of dollars sent to Slovakia, in defiance of the New Jersey trial court's orders. See footnote 1 of this opinion. Accordingly, we agree with the Connecticut trial court that the defendant's wilful, deceitful and misleading financial disclosures, in which the defendant failed to disclose his transfer of millions of dollars overseas, violated the New Jersey trial court's orders, which resulted in the forfeiture of, among other things, the Greenwich property. We also agree with the Connecticut trial court that the defendant's conduct constitutes financial misconduct involving marital assets.[5]

Next, as to whether the defendant's misconduct had a purpose unrelated to the marriage, the Connecticut trial court found that "the [defendant's] pledge of the [Greenwich property] and other marital assets was without the consent of the [plaintiff], was for his sole benefit, and . . . was made for a purpose unrelated to the marriage . . . ." In so finding, the trial court cited the New Jersey litigation as the reason for the pledge and subsequent forfeiture of the Greenwich property,

[5] Indeed, although the defendant appears to challenge the financial misconduct involving marital assets element of dissipation, he concedes that his secret $3 million transfer to Slovakia constituted financial misconduct. It was this conduct, among other things, that resulted in the forfeiture of the Greenwich property.

K. S. *v.* R. S.

a matter in which the plaintiff was not involved and that did not concern the marriage of the plaintiff and the defendant. The record supports the court's finding, and the defendant points to no evidence in the record in support of his contention that his conduct was undertaken in an effort to resolve tension within the marriage or for any other reason related to the marriage. As the trial court concluded, the defendant's pledge of the Greenwich property was for his sole benefit and for the purpose of the lawsuit in New Jersey.

Finally, as to whether the misconduct occurred in contemplation of divorce or while the marriage was in serious jeopardy, the trial court determined that there was "evidence to support a finding that the marriage had been in trouble as early as 2014," with the Greenwich property pledged in 2016 and forfeited in February, 2017. In making this finding, the court credited and relied on testimony from both the plaintiff and the defendant that the marriage had been in serious trouble for many years. The trial court pointed to the testimony of the plaintiff, who stated that the New Jersey litigation, which was commenced prior to the parties' marriage in 2008, was a significant factor in the "downhill slide" of the marriage. The defendant agreed that the New Jersey litigation had impacted the marriage. In *Finan* v. *Finan*, supra, 287 Conn. 491, this court explained that "a trial court may consider evidence that a spouse dissipated marital assets prior to the couple's physical separation . . . so long as the actions constituting dissipation occur either: (1) in contemplation of divorce or separation; or (2) while the marriage is in serious jeopardy or is undergoing an irretrievable breakdown." Id., 499. In the present case, the trial court found that the marriage was undergoing an irretrievable breakdown prior to the pledge or loss of the Greenwich property and thus appropriately considered the actions taken by the defendant prior to the separation of the parties.

Because we determined that the trial court properly ruled as it did on the elements of dissipation, we also conclude that the trial court correctly determined that the defendant's pledge of the Greenwich property constituted dissipation of the marital estate.

II

THE NEW JERSEY LITIGATION

The trial court's treatment of the New Jersey judgment and orders implicates many of the issues raised on appeal and cross appeal. As such, we next address the issues related to the New Jersey litigation, namely, whether the trial court was required to give full faith and credit to the New Jersey judgment and orders, whether the trial court properly considered the Greenwich property and the investment accounts as part of the marital estate, and whether the trial court was required to value the liability incurred by the defendant due to the New Jersey judgment.

To better address the issues related to the overlapping litigation in New Jersey and Connecticut, we lay out a timeline of the relevant orders in both states pertaining to the properties at issue: the Greenwich property and the investment accounts. In mid-September, 2016, the defendant pledged the Greenwich property as collateral for the appeal bond in New Jersey. That same month, the New Jersey trial court issued an order accepting as adequate security pending appeal the deed to the Greenwich property. In its order, the court stated that, "[i]n the event the court finds, after notice and hearing, that [there was] any material misrepresentation in the [sworn accounting of assets and liabilities], [it] will result in forfeiture of the posted security," and that "[t]he assets of [the defendant, his father, Koger, KDS, and KPS], wherever located, are not to be encumbered, secreted, or transferred outside the ordinary course of

K. S. *v.* R. S.

business without the consent of the [intervenor's] counsel or [the] order of the court.''

In January, 2017, the defendant signed an escrow agreement and sent the agreement, along with other documents, to the SFA. The escrow agreement stated in relevant part that "a mortgage on the [Greenwich property] . . . shall be applied for and the proceeds of any mortgage obtained shall be added to the [c]ash [e]scrow . . . as security for the [j]udgment . . . .'' The escrow agreement also stated that "[t]he [e]scrow [a]gent is hereby authorized, upon notice to the other parties, to follow the further instructions of the order of any court with respect to the [c]ollateral . . . .'' In February, 2017, as a result of the defendant's misconduct in transferring assets overseas, the New Jersey trial court issued orders forfeiting the Greenwich property and imposing a constructive trust on the defendant's assets. In March, 2017, that court vested the SFA with a power of attorney over the defendant's rights to the property and directed the SFA to sell the forfeited Greenwich property. On May 12, 2017, the New Jersey trial court ordered that 100 percent of the investment accounts be transferred to the intervenor. Then, on May 15, 2017, the Connecticut trial court issued the PJR order in favor of the plaintiff and attached the Greenwich property and the defendant's investment accounts. Finally, in November, 2017, in response to the plaintiff's actions in impeding the sale of the Greenwich property, the New Jersey trial court ordered the SFA to transfer the Greenwich property directly to the intervenor. Notwithstanding these orders of the New Jersey trial court—that forfeited the Greenwich property and the investment accounts and subsequently transferred them to the intervenor—the Connecticut trial court, in its May 5, 2022 memorandum of decision, included both of these assets in its distribution of the marital estate.

K. S. *v.* R. S.

## A

## Full Faith and Credit

As previously noted, the Connecticut trial court determined that it was not required to give full faith and credit to the New Jersey judgment and orders when it distributed the marital estate. The intervenor argues that, "[a]s a matter of federal constitutional law—which state courts are obligated to follow in applying the full faith and credit [clause]—the New Jersey judgment and postjudgment orders related to the Greenwich property and the [investment] accounts should have been afforded full faith and credit." The intervenor further argues that the following orders by the New Jersey trial court were final and not subject to appeal at the time of the marital dissolution judgment: the orders accepting the defendant's pledge of the Greenwich property, owned by a limited liability company of which the defendant was the sole member, as joint and several security for both the defendant and his father on condition of forfeiture; the orders that forfeited the Greenwich property jointly and severally toward the liability of the defendant and his father; the order directing the defendant to turnover the investment accounts; the order directing the transfer of the Greenwich property; and the order permitting the SFA to transfer the title of the Greenwich property to the intervenor. As to the Connecticut trial court's failure to give the New Jersey judgment and orders full faith and credit, that court indicated that it saw the New Jersey trial court as impermissibly exercising in rem jurisdiction over land in Connecticut. The intervenor, however, argues that the New Jersey trial court's judgment and orders were appropriate because it had in personam jurisdiction over the parties. The defendant agrees with the arguments presented by the intervenor.

For her part, the plaintiff asserts that the Connecticut trial court's failure to afford full faith and credit to the

K. S. *v.* R. S.

judgment and postjudgment orders of the New Jersey trial court was proper.[6] In support of this assertion, the plaintiff argues that the New Jersey trial court lacked jurisdiction to transfer title of a residence located in Connecticut. The plaintiff also contends that the New Jersey judgment was not final at the time of the dissolution judgment because of the pending appeal.

Interpretation of the full faith and credit clause involves a question of federal law, and we are bound by the decisions of the United States Supreme Court concerning the criteria for application of the clause. See, e.g., *Packer Plastics, Inc.* v. *Laundon*, 214 Conn. 52, 55, 570 A.2d 687 (1990). Our review of the trial court's interpretation of the full faith and credit clause there-

---

[6] The plaintiff also argues that New Jersey's res judicata and collateral estoppel principles do not allow claim or issue preclusion to be asserted against a person who was not a party to the original action. The plaintiff therefore concludes that the decisions in the New Jersey litigation are not binding on the plaintiff because she was never a party to that action. The plaintiff's reliance on New Jersey's res judicata and collateral estoppel principles is misplaced. The New Jersey Supreme Court has defined res judicata as "an ancient judicial doctrine which contemplates that when a controversy between parties is once fairly litigated and determined it is no longer open to relitigation." *Lubliner* v. *Board of Alcoholic Beverage Control*, 33 N.J. 428, 435, 165 A.2d 163 (1960). The claims at issue in the New Jersey litigation are entirely unrelated to the claims in the Connecticut marital dissolution action. It is true that there is overlap in the assets at play in both controversies, but that does not mean that the claims are one and the same so as to implicate res judicata principles. The plaintiff's reliance on the doctrine of collateral estoppel fails for the similar reason that the same issue or issues in the New Jersey litigation are not being relitigated in the Connecticut action. See, e.g., *New Jersey Division of Youth & Family Services* v. *R.D.*, 207 N.J. 88, 115, 23 A.3d 352 (2011) (stating that "the term collateral estoppel means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit" (internal quotation marks omitted)). The question of ownership of the assets was never litigated in the New Jersey litigation, nor was it required to be, as the assets were pledged or otherwise attached by the court and later forfeited. The issue here is simply one of whether the assets at issue were still part of the marital estate when the Connecticut trial court entered its orders for purposes of the marital dissolution action.

K. S. *v.* R. S.

fore involves a question of law that is subject to plenary review. See, e.g., *Linden Condominium Assn.*, *Inc.* v. *McKenna*, 247 Conn. 575, 594, 726 A.2d 502 (1999). "The constitutional command of full faith and credit, as implemented by Congress, requires that judicial proceedings . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such [s]tate . . . from which they are taken." (Internal quotation marks omitted.) *Durfee* v. *Duke*, 375 U.S. 106, 109, 84 S. Ct. 242, 11 L. Ed. 2d 186 (1963); see also, e.g., *Meribear Productions*, *Inc.* v. *Frank*, 340 Conn. 711, 724, 265 A.3d 870 (2021) ("[t]he full faith and credit clause requires a state court to accord to the judgment of another state the same credit, validity and effect as the state that rendered the judgment would give it" (internal quotation marks omitted)).

Additionally, "[a] judgment rendered in one state is entitled to full faith and credit only if it is a final judgment, and the judgment is final only if it is not subject to modification in the state in which it was rendered." (Internal quotation marks omitted.) *Krueger* v. *Krueger*, 179 Conn. 488, 490, 427 A.2d 400 (1980). The United States Supreme Court, in discussing the purpose of the full faith and credit clause, dubbed it a "nationally unifying force" that "altered the status of the several states as independent foreign sovereignties, each free to ignore rights and obligations created under the laws or established by the judicial proceedings of the others, by making each an integral part of a single nation, in which rights judicially established in any part are given [nationwide] application." *Magnolia Petroleum Co.* v. *Hunt*, 320 U.S. 430, 439, 64 S. Ct. 208, 88 L. Ed. 149 (1943). The United States Supreme Court, along with federal courts across the country, has held on numerous occasions that, in addition to judgments, court orders may be entitled to full faith and credit. See, e.g., *Under-*

K. S. *v.* R. S.

*writers National Assurance Co.* v. *North Carolina Life & Accident & Health Ins. Guaranty Assn.*, 455 U.S. 691, 705–708, 102 S. Ct. 1357, 71 L. Ed. 2d 558 (1982) (determining that Indiana court orders were entitled to full faith and credit in North Carolina); *Connecticut Bank of Commerce* v. *Republic of Congo*, 309 F.3d 240, 248 (5th Cir. 2002) (concluding that New York court's order was entitled to same preclusive effects in federal court that it would have had in New York).

The United States Supreme Court has further recognized, however, that a state is not required to afford full faith and credit to a judgment rendered by a court that "did not have jurisdiction over the subject matter or the relevant parties"; (internal quotation marks omitted) *V. L.* v. *E. L.*, 577 U.S. 404, 407, 136 S. Ct. 1017, 194 L. Ed. 2d 92 (2016); or when the procedure followed in the original state "involve[d] . . . want of due process . . . ." (Citations omitted.) *Christopher* v. *Brusselback*, 302 U.S. 500, 504, 58 S. Ct. 350, 82 L. Ed. 388 (1938).

At the outset, we highlight that the New Jersey orders forfeiting the Greenwich property and the investment accounts were not subject to the appeal pending in New Jersey at the time of the dissolution judgment. The defendant could have appealed from the orders of the New Jersey trial court but, based on the record available to us, did not do so. The only outstanding issue on appeal in New Jersey at the time of the Connecticut marital dissolution judgment was the New Jersey Appellate Division's reversal in part of the $24.7 million judgment and remand for a calculation of damages with a marketability discount. Regardless of the outcome of that appeal, the New Jersey trial court's orders as to the forfeiture and constructive trust remained in place. We therefore conclude that the New Jersey trial court's orders forfeiting the Greenwich property and imposing a constructive trust on the investment accounts were final orders of

350 Conn. 692 DECEMBER, 2024 719

K. S. *v.* R. S.

that court. See, e.g., *Woodhouse* v. *Woodhouse*, 17 N.J. 409, 417, 111 A.2d 631 (1955) (New Jersey Supreme Court observed that, "[when a] decree or judgment for alimony entered in a foreign state is subject to future modification or revision as to past due or future installments, then such judgment or decree lacks the requisite finality to entitle it to full faith and credit in [New Jersey]"); see also, e.g., *Krueger* v. *Krueger*, supra, 179 Conn. 490 ("judgment is final . . . if it is not subject to modification in the state in which it was rendered" (internal quotation marks omitted)). The Connecticut trial court, then, barring some jurisdictional or constitutional defect in the New Jersey orders, was required to give the orders the same effect as they would be given in New Jersey. See, e.g., *Meribear Productions, Inc.* v. *Frank*, supra, 340 Conn. 724 (requiring state court giving full faith and credit to other state's judgment to give same effect to that judgment as that other state). It is without question that, had the marital dissolution action been filed in a New Jersey court, the court would have credited the orders in considering the assets subject to division and found that the Greenwich property and the investment accounts were no longer part of the marital estate. This is because, like the courts in Connecticut, New Jersey courts have stated that the first step in the equitable distribution of property is deciding what *property of each spouse* is eligible for distribution. See, e.g., *Rothman* v. *Rothman*, 65 N.J. 219, 232, 320 A.2d 496 (1974). The Greenwich property and the investment accounts were no longer property of the defendant. The Connecticut trial court was thus not permitted to treat that property as part of the marital estate—the same as the New Jersey courts would have done— unless there was some other basis on which the Connecticut trial court could have declined to give full faith and credit to the New Jersey trial court's orders.

We next consider the plaintiff's contention that the New Jersey orders were not entitled to full faith and

K. S. *v.* R. S.

credit because the New Jersey trial court lacked jurisdiction to transfer title of a residence located in Connecticut. See, e.g., *V. L.* v. *E. L.*, supra, 577 U.S. 407 (state is not required to afford full faith and credit to judgment rendered by court that "did not have jurisdiction over the subject matter or the relevant parties" (internal quotation marks omitted)). It is undisputed that the New Jersey trial court had in personam jurisdiction over the defendant in this case. In declining to give full faith and credit to the New Jersey orders relating to the Greenwich property, the Connecticut trial court concluded that the New Jersey trial court lacked jurisdiction to directly transfer real property located in Connecticut.[7] The Connecticut trial court reasoned "that title adjudications are actions in rem; jurisdiction to render an in rem decree generally exits only in the courts of the state in which the realty is situated." In support, the trial court cited to this court's decision in *Ivey* v. *Ivey*, 183 Conn. 490, 492–93, 439 A.2d 425 (1981), for the general proposition that a court in one state has no power to directly affect title to real property located in another state.

We agree with the Connecticut trial court to the extent that it concluded that, had the New Jersey trial court attempted to direct the sale of the Greenwich property, standing only on its general authority to affect title to real property, the New Jersey trial court may have been without jurisdiction to do so. See id. (attempts by "courts of one state . . . to affect directly the title to real property located in another state . . . have . . . been denied full faith and credit by the courts of the state in which the real estate purportedly affected lies" (citations omitted)). But that is not the case in the present matter. Rather, the New Jersey trial court had

---

[7] The Connecticut trial court did not conclude that the New Jersey trial court lacked jurisdiction to impose the constructive trust over the defendant's assets.

K. S. *v.* R. S.

before it a party over which it exercised in personam jurisdiction, who voluntarily and properly pledged an asset that he owned as collateral for pursuing an appeal of a judgment of that court. In *Ivey*, this court held that, when "a court has in personam jurisdiction over the parties, it may exercise its equitable power to require one party to convey property to the other. . . . Because such an order operates directly against the parties to the action rather than against the land, it is within the court's jurisdiction." (Citation omitted.) Id., 493. This court further noted that "[o]rders of this sort are accorded full faith and credit . . . ." (Citations omitted.) Id. The present case presents even more straightforward facts because the New Jersey trial court did not direct the defendant to transfer the Greenwich property; rather, the defendant willingly pledged the property as security for his appeal. Furthermore, all subsequent conveyances after the defendant's forfeiture were executed by the SFA pursuant to his power of attorney. The New Jersey trial court's exercise of jurisdiction did not extend, therefore, beyond its permissible in personam jurisdiction over the defendant.[8]

---

[8] A court's order in one state may similarly be denied full faith and credit in another state if the procedures implicated a due process violation. See, e.g., *Christopher* v. *Brusselback*, supra, 302 U.S. 504. The plaintiff appears to argue that the enforcement of the New Jersey orders in this marital dissolution action would violate her due process rights, as she was never joined as a party to the New Jersey litigation. We disagree. The plaintiff's due process rights were not violated by the New Jersey litigation and corresponding orders that divested the defendant of his ownership in the Greenwich property and the investment accounts. As to the Greenwich property, General Statutes § 46b-36 provides in relevant part that "[e]ach spouse shall have power to make contracts with the other spouse or with third persons, to convey to the other spouse or to third persons his or her real and personal estate and to receive conveyances of real and personal estate from the other spouse or from third persons as if unmarried. . . ." The defendant therefore had the right to pledge the Greenwich property, which we also note he was the sole owner of, despite the fact that the plaintiff may have had an interest in the property if it had been a part of the marital estate at the time of dissolution. As to the investment accounts, the plaintiff does not assert, nor does the record indicate, that they were co-owned or jointly owned. She does concede that the defendant "controlled all of the family finances,

K. S. *v.* R. S.

Finally, the Connecticut trial court relied on a public policy rationale for declining to give full faith and credit to the New Jersey judgment and court orders, stating that "the strong public policy for equitable distribution and notions of equity weigh heavily against the loss of the marital estate" and that, "by enforcing the [New Jersey] judgment [and orders], the [Connecticut trial] court would, in essence, hold the [plaintiff] liable for the debts of the [defendant] not incurred in support of the family." Although we are certainly sympathetic to the plaintiff's plight, it is the unfortunate reality of many spouses who bind themselves in marriage to later find that the marital assets, though perhaps once plentiful, have been depleted by forces beyond the control of the spouse. In this case, the defendant had a valid judgment rendered, and corresponding orders issued, against him by a court of law, and it was his right and responsibility to pay for that judgment using the assets he owned. Indeed, the United States Supreme Court, among other courts, has grappled with this unfortunate reality and has concluded that there is no public policy exception to the full faith and credit clause. See, e.g., *Baker* v. *General Motors Corp.*, 522 U.S. 222, 233, 118 S. Ct. 657, 139 L. Ed. 2d 580 (1998) ("decisions [of the United States Supreme Court] support no roving public policy exception to the full faith and credit due judgments" (emphasis omitted; internal quotation marks omitted)); *Finstuen* v. *Crutcher*, 496 F.3d 1139, 1151–52 (10th Cir. 2007) (affirming judgment that applied full faith and credit clause "because there is no roving public policy exception" (internal quotation marks omitted)).

except some modest joint bank funds," and it is therefore likely that the defendant owned the investment accounts in his own name. Regardless, even if the investment accounts were jointly owned, this court has held that a "coholder [of a joint bank account] has a sufficient property interest [in the account] to permit a judgment creditor to exercise a bank execution, pursuant to [statute], against the entire account." (Emphasis omitted.) *Fleet Bank Connecticut, N.A.* v. *Carillo*, 240 Conn. 343, 352, 691 A.2d 1068 (1997).

K. S. *v.* R. S.

Accordingly, we conclude that the Connecticut trial court erred in failing to afford full faith and credit to the New Jersey court orders. Affording the New Jersey court orders full faith and credit in Connecticut is "squarely within the purpose of the [f]ull [f]aith and [c]redit [c]lause," as it "preserve[s] rights acquired or confirmed" by another state, and we are required to recognize those valid and final orders. (Internal quotation marks omitted.) *Thomas* v. *Washington Gas Light Co.*, 448 U.S. 261, 284, 100 S. Ct. 2647, 65 L. Ed. 2d 757 (1980) (plurality opinion).

B

Marital Assets

Having concluded that the Connecticut trial court was required to afford full faith and credit to the New Jersey court orders, we next consider the intervenor's claim that the Connecticut trial court erred in concluding that the Greenwich property and the investment accounts were assets of the marital estate subject to equitable distribution.

We begin with a brief review of the pertinent facts. As discussed, the defendant posted the Greenwich property as collateral for his appeal bond in the New Jersey litigation. When it came to the New Jersey trial court's attention that the defendant and his father had engaged in misconduct by failing to disclose properties in Slovakia and improperly transferring approximately $19.792 million to Slovakia, it ordered the posted assets forfeited and imposed a constructive trust on all of the defendant's assets to secure enforcement of the New Jersey judgment. The New Jersey trial court subsequently ordered that the Greenwich property and the funds in the investment accounts be transferred to the intervenor. The Connecticut trial court, after concluding that the defendant had dissipated those assets, declined to give full faith and credit to the New Jersey

K. S. *v.* R. S.

orders. It treated the Greenwich property and the investment accounts as part of the marital estate and, in its orders, dictated the disposition of those assets.

The intervenor argues that the Greenwich property and the investment accounts were not part of the marital estate at the time of dissolution "because they had been lawfully pledged and forfeited (in the case of the Greenwich property) or lawfully removed through execution process by a sister state (in the case of the [investment] accounts)." The intervenor asserts that 100 percent of both assets should be awarded to him. In support of this argument, the intervenor points to General Statutes § 46b-36 and claims that the statute stands for the proposition that, "during the marriage, either spouse may dispose of [his or her] property without the knowledge or consent of the other spouse."[9] The plaintiff disagrees. She contends that the trial court properly included the Greenwich property and the investment accounts in the marital estate and argues that the trial court relied on established precedent from this court in finding that "property, which otherwise would be considered part of the marital estate, and which a spouse, through his own deliberate malfeasance constituting dissipation, forfeits in a civil action, may still be considered part of the marital estate."

The parties disagree about the applicable standard of review. The plaintiff posits that the proper standard of review in this domestic relations matter is abuse of discretion, whereas the intervenor couches the question as one of statutory interpretation and argues that our review of the issue is plenary. Although we disagree with the intervenor's reasoning, we agree that the applicable standard of review is plenary. The question at

─────────────

[9] The defendant also agrees with the intervenor with respect to the intervenor's arguments related to the Greenwich property and the investment accounts.

K. S. *v.* R. S.

issue is indeed a question of law, specifically, what the legal consequence is, for purposes of the application of General Statutes §§ 46b-81 and 46b-82, of the defendant's forfeiture of the Greenwich property and loss of the investment accounts by virtue of the constructive trust. As the question is one of law, our review of the trial court's judgment is plenary. See, e.g., *Crews* v. *Crews*, 295 Conn. 153, 161, 989 A.2d 1060 (2010).

Given that the Connecticut trial court was required to give full faith and credit to the New Jersey orders, we conclude that the Greenwich property and the investment accounts had been removed from the marital estate prior to the trial court's judgment and, as a result, were not subject to equitable distribution. In the case of the Greenwich property, the defendant voluntarily pledged and submitted the deed to that property to be held in escrow as collateral for his appeal of the New Jersey judgment. The orders of the New Jersey trial court made clear that misconduct by the defendant would lead to forfeiture of the Greenwich property. The Greenwich property was therefore under the control of the New Jersey trial court as of September, 2016, and the court's subsequent orders in February, 2017, made clear that the defendant had forfeited the asset. "Forfeiture" is "[a] punishment annexed by law to some illegal act or negligence in the owner of land, tenements, or hereditaments *whereby he loses all interest therein*." (Emphasis added.) Black's Law Dictionary (5th Ed. 1979) pp. 584–85. As a result of this forfeiture, at the time of the Connecticut trial court's judgment distributing the marital estate, the defendant no longer had an ownership interest in the Greenwich property, which he had voluntarily pledged as collateral for his appeal bond.

As to the investment accounts, the New Jersey trial court properly placed them under constructive trust to secure enforcement of the New Jersey judgment after

the defendant's misconduct in transferring, and refusing to return, funds abroad. See, e.g., *Thieme* v. *Aucoin-Thieme*, 227 N.J. 269, 288–89, 151 A.3d 545 (2016) (New Jersey trial court has power to impose constructive trust when there is some " 'wrongful act' " that resulted in transfer of property). Constructive trusts are imposed by a court when "the holder of the legal title may not in good conscience retain the beneficial interest" and, in such case, "equity converts him into a trustee." (Internal quotation marks omitted.) *Carr* v. *Carr*, 120 N.J. 336, 351, 576 A.2d 872 (1990). By virtue of this constructive trust, which was imposed in February, 2017, the defendant no longer retained his beneficial interest in the investment accounts. Consequently, the investment accounts were not part of the defendant's assets, let alone the marital estate, at the time of the PJR order and the subsequent disposition of the property in the marital dissolution action, which did not occur until May, 2017 and 2022, respectively.

The impact of the New Jersey orders—which forfeited the defendant's ownership of the Greenwich property and placed the investment accounts in a constructive trust—was that both assets were no longer the defendant's property by the time the Connecticut trial court issued the PJR order. Of course, these assets were also not the defendant's property when the court subsequently considered those assets as part of the marital estate for purposes of equitably distributing the assets in May, 2022. As discussed in part I B of this opinion, however, the trial court was not precluded from considering the defendant's *dissipation* of these assets in distributing the marital estate. See, e.g., *O'Brien* v. *O'Brien*, supra, 326 Conn. 93 (trial court may consider whether party had dissipated assets when dividing estate). Rather, the trial court was precluded from treating the *assets* themselves as part of the marital estate and distributing them as it did, as they had already been

K. S. *v.* R. S.

removed from the marital estate by virtue of the New Jersey orders. Put differently, although the trial court could consider the *amount* of the dissipation when equitably distributing the remaining marital assets, it could not distribute the dissipated *assets* themselves, as they were no longer part of the marital estate. The Connecticut trial court's inclusion of the Greenwich property and the investment accounts in the marital estate when it equitably distributed the assets was therefore improper.

C

Valuing the New Jersey Judgment

Finally, with respect to the New Jersey judgment, we consider the defendant's contention that the Connecticut trial court should have valued the $24.7 million liability he had incurred as a result of the New Jersey judgment in determining how to equitably distribute the marital estate. Section 46b-81 governs assignment of property and transfer of title in instances of divorce or annulment. The defendant cites to *Bender* v. *Bender*, 258 Conn. 733, 785 A.2d 197 (2001), for the proposition that "[t]here are three stages of analysis regarding the equitable distribution of each resource" listed in § 46b-81 (c), the second being that the trial court must determine the value of the property at issue. (Internal quotation marks omitted.) Id., 740. The defendant argues that the trial court was thus required to determine the value of the property at issue as part of the analysis regarding the equitable distribution of each resource. See id. The defendant contends that this part of the analysis required the trial court to value the liability he had incurred as a result of the New Jersey judgment. The plaintiff argues that, despite the defendant's wish to have the trial court value the liability from the New Jersey judgment, "the defendant fails to explain how it would have been either appropriate or possible for the Connecticut [trial] court

K. S. *v.* R. S.

to do that, when the New Jersey courts before which that very issue was pending had not yet completed their task of doing so.''

The parties dispute the appropriate standard of review of this issue. The defendant couches the issue as one of statutory interpretation of § 46b-81 and therefore asserts that this court's review is plenary. The plaintiff disagrees and asserts that the abuse of discretion standard applies to this domestic relations matter. The questions before us are whether, under § 46b-81, the trial court was required to value the defendant's liability, which is a question of statutory interpretation; see, e.g., *Bender* v. *Bender*, supra, 258 Conn. 741; and whether it abused its discretion in failing to do so. See, e.g., id., 735–36 (addressing whether, in dissolution action, unvested pension benefits were property subject to equitable distribution pursuant to § 46b-81 and concluding that trial court did not abuse its discretion in formulating its financial award with respect to pension benefits); see also, e.g., id., 739–40 (abuse of discretion standard applies to trial court's orders in domestic relations cases). Section 46b-81 (c) provides in relevant part that, ''[i]n fixing the nature and value of the property, if any, to be assigned, the court, after considering all the evidence presented by each party, shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate, *liabilities* and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. . . .'' (Emphasis added.) This court has explained that ''[t]here are three stages of analysis regarding the equitable distribution of each resource: first, whether the resource is property within § 46b-81 to be equitably distributed (classification); second, what is the appropriate method for

K. S. *v.* R. S.

determining the value of the property (valuation); and third, what is the most equitable distribution of the property between the parties (distribution).'' *Krafick* v. *Krafick*, 234 Conn. 783, 792–93, 663 A.2d 365 (1995).

The defendant in this case asserts that the three stages of analysis apply not only to the property a trial court must divide in a marital dissolution action, but also to the liabilities that § 46b-81 directs a court to consider. We disagree. The defendant cites to no case law, and we are unable to find any, that suggests such an analysis is required.[10] Further, the defendant makes no argument that a liability in and of itself constitutes property for purposes of § 46b-81. A reading of § 46b-81, coupled with the relevant case law, makes clear that the trial court was required to engage in the three stage analysis of any *property* to be assigned in a marital dissolution action. See General Statutes § 46b-81 (c) (providing list of considerations that trial court should take into account ''[i]n fixing the nature and value of the property''); *Bender* v. *Bender*, supra, 258 Conn. 740 (second stage in equitably dividing each resource is to consider ''what is the appropriate method for determining the value of the property'' (internal quotation marks omitted)). Section 46b-81 simply directs the trial court, after it has determined the properties at issue in the estate, to consider, among other things, the liabilities of the parties in equitably dividing such estate. General Statutes § 46b-81 (c) (requiring trial court, ''after considering all the evidence presented by each party, [to] consider the . . . *liabilities* and needs of each of the parties'' (emphasis added)). The trial court in this case was therefore not required to *value* the defendant's

_____

[10] The defendant does cite to *Lopiano* v. *Lopiano*, 247 Conn. 356, 363, 752 A.2d 1000 (1998), for the proposition that monetary judgments have been deemed property for purposes of § 46b-81. However, *Lopiano* stands only for the proposition that monetary winnings may be deemed property for purposes of the statute, not that a liability created by the loss of litigation constitutes property. See id., 358–59, 371.

K. S. *v.* R. S.

liability but, rather, to more generally consider the liabilities of both the plaintiff and the defendant in its equitable division of the marital estate. The court clearly considered the defendant's liability as a result of the New Jersey judgment in fashioning its financial orders because it specifically ordered that a percentage of the sale of the Greenwich property, along with a percentage of the investment accounts, would go toward paying off the defendant's debt. We therefore cannot conclude that the trial court abused its discretion in its treatment of the defendant's liability from the New Jersey judgment.

## III

## EARNING CAPACITY

We next turn to the defendant's contention that the trial court incorrectly determined his earning capacity. The following facts are relevant to our resolution of this claim. The trial court found the defendant's annual earning capacity to be $400,000. In support of this finding, the court stated that there was "no evidence to support a finding that the [defendant] is disabled or unable to obtain and hold gainful employment commensurate with his education and experience; that the [defendant] has by his choice remained unemployed; that, under certain circumstances, such as [when] a party purposely quits [his or her] job or suppresses [his or her] income, a court may base an alimony or support order on the earning capacity of that party . . . [and] that, in arriving at earning capacity, the court can look to [the party's] employment and income history, as shown, among other things, on [his or her] federal income tax returns . . . ." (Citations omitted.) Although the trial court did not explicitly discuss these considerations in its memorandum of decision, in determining the defendant's annual earning capacity, the court properly could have considered the defendant's past income during his twenty years of work experience, including the amounts

K. S. *v.* R. S.

that were set by the court-appointed SFA during the last years of the defendant's employment; his vocational skills, as evidenced from his job duties as the former COO of Koger; and his education.

On appeal, the defendant argues that there was insufficient evidence of his earning capacity in the United States to support the trial court's determination of his earning capacity. Although the defendant admits that prior earnings may be appropriate for a court to rely on in some cases, he contends that the trial court improperly did so in this case because his compensation at Koger "was never set by the market" but, rather, by his father or the SFA. The defendant argues that, because he cannot return to Koger, his past earnings from the company were not appropriately considered.[11]

The plaintiff argues that this court has repeatedly held that past income provides a sufficient basis for a finding of earning capacity and points out that the trial court made a conservative estimate when it found the defendant's annual earning capacity to be $400,000, an amount much lower than the defendant's actual past earnings. The plaintiff points to the following as support for the trial court's determination: the evidence showed that, from 2015 through 2017, the defendant earned an average annual income in excess of $1 million as the COO of Koger; the court declined to find the defendant's

---

[11] Additionally, the defendant designates a small portion of this part of his brief to an argument that even less evidence was presented at trial that he could earn $400,000 per year in the Czech Republic. The defendant argues that, because the trial court ordered that the children may relocate to the Czech Republic with the plaintiff, and because the court found that the defendant has the ability to do so as well, it should have found his earning capacity in the Czech Republic specifically. The trial court made no finding on this issue; nor did it make a finding that the defendant would be relocating to the Czech Republic. Because the trial court made no finding regarding the defendant's earning capacity in the Czech Republic, we decline to consider this argument. See, e.g., *Ammirata* v. *Zoning Board of Appeals*, 264 Conn. 737, 744, 826 A.2d 170 (2003) ("[i]t is well established that the appellant bears the burden of providing an appellate court with an adequate record for review" (internal quotation marks omitted)).

K. S. *v.* R. S.

earning capacity to be anywhere near this number; the SFA, a court-appointed agent who is "duty bound" to oversee Koger's operations, set the defendant's income at various points at $600,000, $480,000, and $420,000; and the court had extensive evidence of the nature of the defendant's responsibilities as the COO of Koger.

We begin with the standard of review and the relevant legal principles. It is well settled that a trial court's finding of earning capacity is subject to reversal only if it is clearly erroneous. See, e.g., *Tilsen* v. *Benson*, 347 Conn. 758, 800, 299 A.3d 1096 (2023). "Earning capacity . . . is not an amount [that] a person can theoretically earn, nor is it confined to actual income, but rather it is an amount [that] a person can realistically be expected to earn considering such things as his [or her] vocational skills, employability, age and health." (Internal quotation marks omitted.) Id., 799. "Awards of alimony and support that are based on earning capacity must be supported by evidence that includes 'specific amounts' of past earnings, or of vocational evidence as to 'the typical salary' of the imputed party's occupation considering that party's 'ability and experience.' " Id., 800.

In this case, the trial court considered evidence of the defendant's past income, set not only by his father, but also by the court-appointed SFA. The court also looked at the defendant's education and the skills that were required to fulfill his duties at Koger and found these to be indicative of his earning capacity. The trial court's finding of earning capacity on the basis of this evidence is consistent with our case law. See, e.g., *Tracey* v. *Tracey*, 97 Conn. App. 122, 124, 130, 902 A.2d 729 (2006) (trial court's finding that defendant's earning capacity was $47,000 to $48,000 per year for child support purposes was "supported by evidence in the record of the defendant's prior earnings, vocational skills and unwillingness to pursue jobs similar to that from which

K. S. *v.* R. S.

he had been laid off''). Further, the defendant could have submitted his own evidence to establish his earning capacity and to rebut the plaintiff's claim. He failed to do so. This court has held that, when a party could have provided evidence of his or her earning capacity but failed to do so (or chose not to), it is appropriate for the trial court to rely on the evidence that was submitted and available. See, e.g., *Tilsen* v. *Benson*, supra, 347 Conn. 802 (''in the absence of vocational evidence as to his reduced employability or earning capacity resulting from his age or the termination of his employment—which the plaintiff himself could have, but did not, proffer—the trial court reasonably relied on his total contracted gross compensation . . . from the final year of his employment'' (footnote omitted)). Considering the evidence at the trial court's disposal, coupled with the defendant's failure to put forth any evidence disputing the plaintiff's claim regarding his earning capacity, we cannot conclude that the trial court's finding of earning capacity was clearly erroneous.

IV

CHILD SUPPORT

The defendant next contends that the trial court incorrectly calculated the child support award. The court calculated the defendant's share of child support based on the net income of the plaintiff and the defendant, which it determined by using the actual net income of the plaintiff and the net income of the defendant based on the earning capacity it had established. See part III of this opinion. Specifically, the court found the plaintiff's net income to be $348 per week, and, using the defendant's earning capacity of $400,000 per year, it found that the combined net income of the parties was $5080 per week. Using the child support and arrearage guidelines (child support guidelines), the trial court went on to find that the presumptive child support amount was $708 per week. The court concluded, however, that

734 DECEMBER, 2024 350 Conn. 692

K. S. *v.* R. S.

it was equitable to award additional child support in the amount of $96 per week, for a total of $804 of child support per week. The trial court determined that the defendant's share of child support totaled $749 per week.

The defendant argues that the trial court improperly used his earning capacity to compute the appropriate amount of child support. The defendant contends that the court should have first articulated the presumptive amount of child support based on his actual income. If the court concluded that the amount would not be sufficient, the defendant contends, it should have made a specific finding that this amount would be inequitable or inappropriate, and then turned to the defendant's earning capacity as a criterion for deviating from the presumptive amount. The plaintiff disagrees and argues that this court has ''long ago held that, [when] the non-custodial parent has zero income, it is appropriate for the trial court to base an award of child support on earning capacity rather than on actual earned income.'' (Emphasis omitted.) The plaintiff points out that the defendant does not take issue with the amount of child support the trial court arrived at but, rather, with its failure to state the obvious conclusion that the presumptive child support amount, calculated by using actual income, would be zero.[12]

''The well settled standard of review in domestic relations cases is that this court will not disturb trial court

_____

[12] The plaintiff also argues that the defendant raises this claim for the first time on appeal, rendering it unpreserved and unreviewable. We are not persuaded. At trial, the defendant argued against child support and the use of earning capacity. Moreover, the manner in which the trial court would apply the child support guidelines was not known to the defendant until it issued its memorandum of decision. A party may appeal an issue that ''arose subsequent to the trial.'' Practice Book § 60-5; see also, e.g., *Keusch* v. *Keusch*, 184 Conn. App. 822, 827, 830 n.6, 195 A.3d 1136 (2018) (concluding that defendant did not waive argument that trial court erroneously had computed defendant's child support obligation on basis of his earning capacity rather than his actual earnings when it was not clear that court relied on defendant's earning capacity in determining child support amount until it was ordered to articulate basis for its conclusion).

orders unless the trial court has abused its legal discretion or its findings have no reasonable basis in the facts.
. . . As has often been explained, the foundation for this standard is that the trial court is in a clearly advantageous position to assess the personal factors significant to a domestic relations case . . . .'' (Internal quotation marks omitted.) *Maturo* v. *Maturo*, 296 Conn. 80, 87, 995 A.2d 1 (2010). ''The question of . . . to what extent . . . the child support guidelines apply . . . is a question of law over which this court should exercise plenary review.'' *Misthopoulos* v. *Misthopoulos*, 297 Conn. 358, 367, 999 A.2d 721 (2010). The child support guidelines provide explicit guidance to trial courts as to how to calculate the presumptive amount of child support due. See Child Support and Arrearage Guidelines (2015) pp. 5–8, 9–17. This court has stated that ''[General Statutes] § 46b-215b (a) made four significant changes in the child support guidelines that had the effect of displac[ing] the flexible and nondirective approach [the trial courts had] previously taken. . . . These changes included requirements that (1) the guidelines shall be considered in all determinations of child support amounts within the state . . . (2) there shall be a rebuttable presumption that the amount of such awards which resulted from the application of such guidelines is the amount . . . to be ordered . . . (3) in order to rebut the presumption in such case, the [trial] court . . . must make a specific finding on the record that the application of the guidelines would be inequitable or inappropriate in a particular case . . . and (4) such a specific finding must be determined under [the deviation] criteria established by the [C]omission [for Child Support Guidelines].'' (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Maturo* v. *Maturo*, supra, 115–16. The Appellate Court has aptly ''stated that the reason why a trial court must make an on-the-record finding of the presumptive [child] support

K. S. *v.* R. S.

amount before applying the deviation criteria is to facilitate appellate review in those cases in which the trial court finds that a deviation is justified. . . . In other words, the finding will enable an appellate court to compare the ultimate order with the guideline amount and make a more informed decision on a claim that the amount of the deviation, rather than the fact of a deviation, constituted an abuse of discretion.'' (Citation omitted; internal quotation marks omitted.) *Budrawich* v. *Budrawich*, 132 Conn. App. 291, 300, 32 A.3d 328 (2011).

We agree with the defendant that the trial court was required to first make a finding of the presumptive child support amount as prescribed by the child support guidelines, as it is required to do in every case. If the trial court then concluded that this presumptive amount would be inequitable or inappropriate, it was required to make that finding explicitly before it could point to a specific deviation criterion and rely on it to make the deviation. See, e.g., *Anketell* v. *Kulldorff*, 207 Conn. App. 807, 820, 263 A.3d 972 (''[o]ur [appellate] courts have interpreted [the applicable] statutory and regulatory language as requiring three distinct findings in order for a [trial] court to properly deviate from the child support guidelines in fashioning a child support order: (1) a finding of the presumptive child support amount pursuant to the guidelines; (2) a specific finding that application of such guidelines would be inequitable [or] inappropriate; and (3) an explanation as to which deviation criteria the [trial] court is relying on to justify the deviation'' (internal quotation marks omitted)), cert. denied, 340 Conn. 905, 263 A.3d 821 (2021). The trial court failed to follow this prescribed approach, and, therefore, the record lacks the necessary findings to permit the court's deviation from the child support guidelines. Specifically, the court, in calculating the amount of child support, used the defendant's earning capacity in the first instance to calculate his net income and, from there,

K. S. *v.* R. S.

the net income of the parties. The trial court failed to make a finding of the presumptive amount of child support and failed to make a finding that the presumptive amount, as found by applying the child support guidelines, was inequitable or inappropriate.

We agree with the plaintiff that, had the trial court followed the proper procedure and first found the presumptive amount of child support by using the plaintiff's net weekly income and then the defendant's net weekly income, which, according to the record, would have been $0, it then may have found the child support amount to be inequitable or inappropriate and deviated from the child support guidelines using the defendant's earning capacity. Had the trial court done this, it may have come to the same result and awarded child support as it did in its original decision. We decline, however, to make this assumption about what the trial court did or did not find in deviating from the child support guidelines. We agree with the reasoning of the Appellate Court in a similar case and conclude that "[a]ffirming the judgment with respect to the child support orders would amount to sanctioning the [trial] court's bypassing of and noncompliance with the [child support] guidelines' clear and firm requirements regarding the use of deviation criteria and presumptive support amounts." (Internal quotation marks omitted.) *Barcelo* v. *Barcelo*, 158 Conn. App. 201, 217, 118 A.3d 657, cert. denied, 319 Conn. 910, 123 A.3d 882 (2015). Further, the trial court's lack of findings in this area makes it impossible for us to review whether such a deviation was justified. See, e.g., *Budrawich* v. *Budrawich*, supra, 132 Conn. App. 300–301.

V

RELOCATION

We next turn to the defendant's contention that the trial court erred in allowing the plaintiff to relocate to the Czech Republic with their children.

K. S. *v.* R. S.

The following additional facts and procedural history are relevant to our analysis. In 2020, during the pendency of this marital dissolution action, the plaintiff relocated with the two minor children to the Czech Republic, contrary to court orders. The trial court subsequently granted the plaintiff and the defendant joint legal custody of the children but permitted the plaintiff to relocate with the children to the Czech Republic and issued a variety of orders that would apply should she choose to do so. The trial court stated that its decision was guided by the best interests of the children and pointed to numerous factors that it relied on in making its decision. Specifically, the court found that the defendant could maintain his relationship with the children by relocating to the Czech Republic if he desired, the children's transition to school in the Czech Republic was "excellent" and "without any major problems," the children's family ties supported an adjustment to life in the Czech Republic, the plaintiff will serve as the primary caregiver for the children and will be able to do so in the Czech Republic, the children's health will not be adversely affected by the relocation, and the children's cultural background, such as their speaking of Czech at home, supported the transition.

The defendant argues that the trial court failed to properly apply the best interests of the child standard because it did not find any affirmative reasons for permitting the relocation of the children to the Czech Republic but, rather, found only that the parties could take steps to mitigate the potential harms resulting from relocation. The defendant also posits that the trial court improperly relied on evidence obtained from the plaintiff's "clear misconduct" in moving their children to the Czech Republic without his consent, which "effectively rewarded" the plaintiff for her illegal action. For her part, the plaintiff argues that the trial court correctly decided that she may relocate to the Czech Republic

350 Conn. 692 DECEMBER, 2024 739

K. S. *v.* R. S.

with the children because it properly considered the best interests of the family unit as a necessary component of the best interests of the child inquiry. With respect to the trial court's consideration of the evidence presented pertaining to the children's time in the Czech Republic in 2020, the plaintiff argues that the defendant raises this issue for the first time on appeal to this court, and it is thus unpreserved. Alternatively, the plaintiff contends that this evidence provides excellent insight into the best interests of the children and that the trial court thus properly considered it.

"The well settled standard of review in domestic relations cases is that this court will not disturb trial court orders unless the trial court has abused its legal discretion or its findings have no reasonable basis in the facts." (Internal quotation marks omitted.) *Maturo* v. *Maturo*, supra, 296 Conn. 87; see, e.g., *Tow* v. *Tow*, 142 Conn. App. 45, 52, 64 A.3d 128 (2013) ("[An appellate court's] standard of review of a trial court's decision regarding . . . relocation orders is one of abuse of discretion. . . . It is within the province of the trial court to find facts and draw proper inferences from the evidence presented. . . . Further, [t]he trial court has the opportunity to view the parties [firsthand] and is therefore in the best position to assess the circumstances surrounding a dissolution action, in which such personal factors as the demeanor and attitude of the parties are so significant." (Internal quotation marks omitted.)); see also, e.g., *Ridgeway* v. *Ridgeway*, 180 Conn. 533, 541, 429 A.2d 801 (1980); *Taylor* v. *Taylor*, 119 Conn. App. 817, 821, 990 A.2d 882 (2010). "In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action." (Internal quotation marks omitted.) *Bender* v. *Bender*, supra, 258 Conn. 740.

At the outset, we address the defendant's argument that the trial court improperly relied on evidence obtained when the plaintiff relocated with their children to the Czech Republic without his consent. In essence, the defendant appears to argue that, because the plaintiff improperly took the children to the Czech Republic, the trial court should not have considered any evidence of how the children fared during that time. We disagree. First, although the defendant raised discrete objections to certain evidence regarding the children's stay in the Czech Republic, he never argued before the trial court that a blanket prohibition on all evidence regarding the children's time in the Czech Republic must apply. Thus, this evidentiary claim is unpreserved. See, e.g., *United Technologies Corp.* v. *East Windsor*, 262 Conn. 11, 30, 807 A.2d 955 (2002). Even if the defendant had raised this claim before the trial court, he cites no support for the application of a blanket prohibition. More important, although we are mindful that the trial court's consideration of this evidence may be perceived as rewarding the plaintiff's improper actions, the defendant's suggestion of a blanket prohibition on certain evidence runs counter to the guiding principle to which the trial court must adhere when making custody and relocation decisions—the best interests of the child. See, e.g., *Ireland* v. *Ireland*, 246 Conn. 413, 430, 717 A.2d 676 (1998) ("the best interests of the child must always govern decisions involving custodial or visitation matters"). Accordingly, we turn to the defendant's contention that the trial court failed to properly apply the best interests of the child standard because it did not find any affirmative reasons for permitting the relocation of the children to the Czech Republic but, rather, found only that potential harms could be mitigated.

Orders involving the relocation of either parent with a minor child are governed by General Statutes § 46b-56d. Subsection (a) of § 46b-56d provides in relevant

K. S. *v.* R. S.

part that "the relocating parent shall bear the burden of proving, by a preponderance of the evidence, that (1) the relocation is for a legitimate purpose, (2) the proposed location is reasonable in light of such purpose, and (3) the relocation is in the best interests of the child." Subsection (b) of § 46b-56d further provides that, "[i]n determining whether to approve the relocation of the child under subsection (a) of this section, the court shall consider, but such consideration shall not be limited to: (1) Each parent's reasons for seeking or opposing the relocation; (2) the quality of the relationships between the child and each parent; (3) the impact of the relocation on the quantity and the quality of the child's future contact with the nonrelocating parent; (4) the degree to which the relocating parent's and the child's life may be enhanced economically, emotionally and educationally by the relocation; and (5) the feasibility of preserving the relationship between the nonrelocating parent and the child through suitable visitation arrangements." These factors are not exclusive. See, e.g., *Regan* v. *Regan*, 143 Conn. App. 113, 123, 68 A.3d 172 (2013) (statutory criteria for determining whether to approve proposed relocation of child are not all-inclusive and are intended to provide trial court with flexibility in its assessment of competing interests), appeal dismissed, Conn. Supreme Court, Docket No. SC 19210 (October 15, 2014).

Additionally, General Statutes § 46b-56 (c) enumerates factors a trial court may consider in determining the best interests of a child: "(1) The physical and emotional safety of the child; (2) the temperament and developmental needs of the child; (3) the capacity and the disposition of the parents to understand and meet the needs of the child; (4) any relevant and material information obtained from the child, including the informed preferences of the child; (5) the wishes of the child's parents as to custody; (6) the past and current

K. S. *v.* R. S.

interaction and relationship of the child with each parent, the child's siblings and any other person who may significantly affect the best interests of the child; (7) the willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders; (8) any manipulation by or coercive behavior of the parents in an effort to involve the child in the parents' dispute; (9) the ability of each parent to be actively involved in the life of the child; (10) the child's adjustment to his or her home, school and community environments; (11) the length of time that the child has lived in a stable and satisfactory environment and the desirability of maintaining continuity in such environment, provided the court may consider favorably a parent who voluntarily leaves the child's family home pendente lite in order to alleviate stress in the household; (12) the stability of the child's existing or proposed residences, or both; (13) the mental and physical health of all individuals involved, except that a disability of a proposed custodial parent or other party, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interests of the child; (14) the child's cultural background; (15) the effect on the child of the actions of an abuser, if any domestic violence, as defined in section 46b-1, has occurred between the parents or between a parent and another individual or the child; (16) whether the child or a sibling of the child has been abused or neglected, as defined respectively in section 46b-120; and (17) whether the party satisfactorily completed participation in a parenting education program established pursuant to section 46b-69b.'' Section 46b-56 (c) clarifies that ''[t]he court is not required to assign any weight to any of the factors that it considers, but shall articulate the basis for its decision.''

The trial court's custody order in this case indicates that the court considered many of the statutory factors

K. S. *v.* R. S.

set forth in §§ 46b-56 (c) and 46b-56d (b), insofar as the court articulated the basis for its decision. Specifically, the court pointed to the ability of the defendant to maintain a relationship with his children due to his flexible living situation, coupled with a communication schedule outlined in the parties' custody agreement, and considered the plaintiff's reasons for relocating. See General Statutes § 46b-56d (b) (1) (directing trial court to consider "[e]ach parent's reasons for seeking or opposing the relocation"); General Statutes § 46b-56d (b) (3) (directing trial court to consider "the impact of the relocation on the quantity and the quality of the child's future contact with the nonrelocating parent"); General Statutes § 46b-56d (b) (5) (directing trial court to consider "the feasibility of preserving the relationship between the nonrelocating parent and the child through suitable visitation arrangements"). The court further concluded that the factors enumerated in § 46b-56 (c) supported its decision that the relocation was in the best interests of the children insofar as the plaintiff has provided, and will be able to continue to provide, a stable environment for the children; the children's transition to school in the Czech Republic was "excellent"; the plaintiff, the defendant, and their children were in good mental and physical health, which would not be affected by the relocation; and the children had strong cultural ties to the Czech Republic, such as speaking the country's official language, Czech, at home. See General Statutes § 46b-56 (c) (10) (trial court may consider "the child's adjustment to his or her home, school and community environments"); General Statutes § 46b-56 (c) (11) (trial court may consider "the length of time that the child has lived in a stable and satisfactory environment and the desirability of maintaining continuity in such environment"); General Statutes § 46b-56 (c) (13) (trial court may consider "the mental and physical health of all individuals involved"); General

K. S. *v.* R. S.

Statutes § 46b-56 (c) (14) (trial court may consider "the child's cultural background").

Moreover, in making its determinations, the trial court considered the testimony of two experts. The first, a family relations counselor, testified that a home study had been conducted in the Czech Republic while the plaintiff was in that country. The counselor concluded that it was in the best interests of the children to relocate with the plaintiff to the Czech Republic, noting evidence of the defendant's coercive behavior and lack of insight into the children's needs, and the plaintiff's role as the primary caregiver. The second expert, a psychologist, testified that the negative impact of a relocation can be mitigated by a close sibling relationship during the transition, as exists here. Moreover, we have explained that a trial court's analysis concerning relocation may "[take] into consideration the interests of the new family unit as a whole [because such an analysis] is consistent with the best interests of the child standard. In fact . . . an attempt to determine what is best for the child without consideration of what is best for the family unit, with whom the child spends the most significant amount of his or her time, would be an incomplete inquiry." *Ireland* v. *Ireland*, supra, 246 Conn. 430–31. Because the trial court considered the testimony of two experts and was clearly guided by the statutory factors in considering the evidence presented, and it articulated this in its decision, we are unable to conclude that the court abused its discretion in finding that the plaintiff should be allowed to relocate with the children.

The defendant argues that the trial court's approval of the plaintiff's relocation with the children, particularly when the relocation is to another country, "inevitably damages the children's relationship with the nonrelocating parent." The defendant notes that he has a " 'close, affectionate bond' " with the children, who will

K. S. *v.* R. S.

now be separated from him by a nine hour flight, and points to concerns that the court initially had about the children's schooling in the Czech Republic. Although we find the defendant's argument persuasive and cannot say whether we would have reached the same conclusion as the trial court with respect to relocation had we been in its position, that is not the standard of review we must employ. The question is whether, after indulging every reasonable presumption in favor of the correctness of the trial court's decision; see, e.g., *Bender* v. *Bender*, supra, 258 Conn. 740; we nevertheless conclude that the court abused its discretion. In other words, in order to reverse the judgment of the trial court on this issue, we must conclude that the court could not have reasonably concluded as it did. See, e.g., *Reville* v. *Reville*, 312 Conn. 428, 440, 93 A.3d 1076 (2014). We cannot conclude that the trial court abused its discretion when it based its decision on the application of the various statutory factors and considered the testimony of two experts.

## VI

## MOTION FOR CONTEMPT

We next turn to the defendant's contention, subsumed in the portion of his brief regarding dissipation, that the trial court erred in granting the plaintiff's pendente lite motion for contempt.

In 2021, the plaintiff filed a motion for contempt, pendente lite, citing multiple actions taken by the defendant that either limited her ability to pay for family expenses or threatened to limit her ability to do so. Specifically, the plaintiff claimed that the defendant took the following actions in violation of automatic court orders: (1) the defendant unilaterally canceled the plaintiff's American Express credit card, which had previously been paid by the defendant throughout the pendency of the action; (2) the defendant notified the

K. S. *v.* R. S.

plaintiff that he would no longer pay for the family's health insurance policy; (3) the defendant refused to pay the electric and gas bills and had provided the plaintiff's contact information to utility providers for her to pay instead; and (4) the defendant notified the plaintiff that he intended to cancel her automobile insurance. The trial court granted the plaintiff's motion and stated that "[t]he evidence support[ed] a finding [that] . . . (1) . . . the [defendant] had the means, as well as a significant earning capacity, to maintain his obligation to continue to support the family throughout the pendency of the action; (2) . . . [the defendant] provided sporadic and selective support; (3) . . . the [plaintiff] was forced to use the proceeds from the sale of the . . . New Jersey condominium . . . to support herself and the children; and (4) . . . the court has taken the [defendant's] actions into account in equitably dividing the marital estate."

The defendant argues that the trial court erred in holding him in contempt for failing to support the plaintiff. In support of this contention, the defendant asserts that there was no clear and unambiguous order necessitating that he provide the plaintiff this support and that "[a] sufficiently clear and unambiguous [order] is a necessary prerequisite for a finding of contempt because [t]he contempt remedy is particularly harsh . . . ." (Internal quotation marks omitted.) The plaintiff contends that the record provides adequate support for the court's finding that the defendant had failed in his obligation to support the family and had refused to look for work for several years.

"It is the burden of the party seeking an order of contempt to prove, by clear and convincing evidence, both a clear and unambiguous directive to the alleged contemnor and the alleged contemnor's wilful noncompliance with that directive." *Puff* v. *Puff*, 334 Conn. 341, 365, 222 A.3d 493 (2020). "The question of whether the

K. S. *v.* R. S.

underlying order is clear and unambiguous is a legal inquiry subject to de novo review. . . . If we answer that question affirmatively, we then review the trial court's determination that the violation was wilful under the abuse of discretion standard.'' (Citation omitted.) Id., 365–66.

In her motion for contempt, the plaintiff pointed to three automatic orders issued by the trial court, all pertaining to insurance coverages or insurance policies. These orders come from the trial court's notice of automatic court orders, issued in 2017. The orders provide that neither party may take action that causes, among other things, the children or the other party to be removed from medical insurance coverage or automobile insurance coverage. In her motion, the plaintiff asserted that several actions taken by the defendant were wilful violations of these orders, such as notifying her that he would no longer pay for the family's health insurance policy and that he would be canceling her automobile insurance coverage.

We conclude that the trial court improperly granted the plaintiff's motion for contempt as to the defendant's duty to maintain insurance coverages. In her motion, the plaintiff alleged that the defendant had *threatened* to no longer pay for the family's health insurance policy and that he would be canceling her automobile insurance policy. For example, the plaintiff alleged that the defendant had notified her that "he *intends* to cancel her automobile insurance . . . ." (Emphasis added.) Although a portion of the plaintiff's contempt motion, in which the plaintiff requested that the court order that the defendant "immediately reinstate the family's health insurance policy and [automobile] insurance associated with the [plaintiff's] vehicle and . . . pay all premiums associated with the same,'' could be read to imply that certain insurance coverages had been canceled, the plaintiff otherwise alleged mere threats

K. S. *v.* R. S.

of cancellation, and the trial court, in its order, made no finding that the insurance was actually canceled. Indeed, the court, in its memorandum of decision, also failed to make an explicit finding of a wilful violation with respect to the insurance coverages issue. Moreover, the court never identified what specific evidence demonstrated the violation. Given the due process implications involved in a judgment of contempt, we have explained that a finding of contempt "cannot be based on representations of counsel in a motion, but must be supported by evidence produced in court at a proper proceeding." (Internal quotation marks omitted.) *Puff* v. *Puff*, supra, 334 Conn. 366. As such, we conclude that the trial court abused its discretion in finding the defendant in contempt for a violation of the automatic orders pertaining to insurance coverages.

The plaintiff also claimed in her motion that the defendant violated apparent orders of the trial court by failing to maintain other avenues of support, such as maintaining and paying off a joint credit card. The plaintiff failed to identify any clear and unambiguous order of the trial court that required the defendant to do so, and we did not find that any such order existed. Accordingly, we conclude that the trial court abused its discretion in granting the plaintiff's motion for contempt as to these other claimed violations.

## VII

## FRAUDULENT TRANSFER

Finally, we turn to the intervenor's contention, raised on cross appeal, that the PJR attachment constituted a fraudulent transfer. In the marital dissolution action, the Connecticut trial court granted a PJR order securing the Greenwich property and other marital assets, including the investment accounts, in favor of the plaintiff. The intervenor argued before the trial court that the defendant's request for, and consent to, the entry

of the PJR order constituted a fraudulent transfer because the intervenor had an ownership interest in the assets subject to the order. The trial court disagreed, concluding that there was "no credible evidence that the filing of the complaint for the dissolution of marriage by the [plaintiff] was brought about by any collusion with the [defendant, and] . . . that a party to an action for dissolution of marriage is entitled to avail [himself or herself] of the protective provisions of a prejudgment remedy."

The intervenor now argues before this court that the trial court erred in denying his fraudulent transfer claim because the defendant's request for, and consent to, the entry of the PJR order, and the resultant award of 35 percent of the assets to the plaintiff, was a fraudulent transfer. The intervenor contends that the transfer constituted an "actual fraudulent transfer" because it had "the applicable badges of fraud set forth in [General Statutes] § 52-552e (b)" and "showed that the defendant had actual intent to hinder, delay or defraud [a] creditor of the debtor . . . ." (Citations omitted; internal quotation marks omitted.) The "badges of fraud" the intervenor refers to include that the plaintiff was an insider, the defendant retained possession or control over the transferred property, the PJR was concealed from the intervenor and the New Jersey courts until after it was entered, the PJR included substantially all of the defendant's assets, the defendant was insolvent, and the PJR order was issued shortly after the New Jersey judgment. See General Statutes § 52-552e (b). In support of these contentions, the intervenor points to *Canty* v. *Otto*, 304 Conn. 546, 41 A.3d 280 (2012), a case he claims is substantially similar to the present case, in which this court concluded that a fraudulent transfer had occurred within the context of a marital dissolution judgment. See id., 548–49, 556, 567–68. For her part, the plaintiff argues that the trial court correctly concluded that the PJR was not a fraudulent transfer because the court

K. S. *v.* R. S.

properly found that there was no credible evidence of collusion between the plaintiff and the defendant.

"The determination of whether a fraudulent transfer took place is a question of fact and it is axiomatic that [t]he trial court's [factual] findings are binding [on] this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. The elements of fraudulent conveyance, including whether the defendants acted with fraudulent intent, must be proven by clear, precise and unequivocal evidence." (Internal quotation marks omitted.) *McKay* v. *Longman*, 332 Conn. 394, 417, 211 A.3d 20 (2019).

In *Canty*, this court concluded that a distribution of marital assets in a dissolution action may constitute a "transfer of assets" under the Uniform Fraudulent Transfer Act, General Statutes § 52-552a et seq. *Canty* v. *Otto*, supra, 304 Conn. 559. The trial court in *Canty* pointed to numerous facts that supported a finding of probable cause that the marital dissolution action was commenced with the intention of fraudulently transferring assets to the wife, notably, that the wife "still loved" her husband and wanted him to live with her after his release from jail and that she "did not truly intend to divorce" her husband but, rather, "to conspire with him to obtain a judgment of dissolution in order to shield [his] assets . . . ." Id., 551.

Like the intervenor, we find *Canty* instructive. Although we agree that there are some similarities between the facts at issue in this case and those in *Canty*, a review of *Canty* reveals that, in order to establish a claim for fraudulent conveyance of marital assets, there must be

K. S. *v.* R. S.

facts that demonstrate a clear and concerted effort taken by the husband and wife to fraudulently transfer assets and shield them from a potential creditor. See id. (trial court found that wife did not truly intend to divorce husband but sought to "conspire" with him in order to shield assets); see also id., 566–68. Unlike in *Canty*, the trial court in this case made a factual finding that no collusion occurred between the plaintiff and the defendant with regard to the PJR order. There is evidence in the record supporting the trial court's factual finding that there was no collusion, and there is no evidence in the record to support a conclusion that the plaintiff and the defendant entered into a sham divorce proceeding to conspire to shield assets from the intervenor. Accordingly, we conclude that the intervenor failed to satisfy his burden of proving that such a fraudulent transfer occurred.

VIII

SCOPE OF REMAND

We must now consider whether our conclusions that the trial court improperly (1) failed to afford full faith and credit to the New Jersey court orders, (2) included the Greenwich property and investment accounts when equitably distributing the estate, (3) found the defendant in contempt, and (4) calculated child support, requires that we direct the trial court to reconsider all of its financial orders. "We previously have characterized the financial orders in dissolution proceedings as resembling a mosaic, in which all the various financial components are carefully interwoven with one another. . . . Accordingly, when an appellate court reverses a trial court judgment based on an improper alimony, property distribution, or child support award, the appellate court's remand typically authorizes the trial court to reconsider all of the financial orders." (Internal quotation marks omitted.) *Misthopoulos* v. *Misthopoulos*,

K. S. *v.* R. S.

supra, 297 Conn. 389. We have also explained, however, "that [e]very improper order . . . does not necessarily merit a reconsideration of all of the trial court's financial orders. A financial order is severable when it is not in any way interdependent with other orders and is not improperly based on a factor that is linked to other factors. . . . In other words, an order is severable if its impropriety does not place the correctness of the other orders in question." (Internal quotation marks omitted.) Id., 389–90. We conclude that the trial court's erroneous financial orders are so intertwined with its other financial orders that we are unable to determine whether all of those other financial awards would remain intact in light of our conclusion as to the improperly decided financial awards. In particular, given that the trial court considered the defendant's contemptuous conduct—which we have concluded was improper— when it equitably distributed the estate, we cannot say that any of the financial orders are severable from the others. Therefore, on remand, the trial court must reconsider all of the financial orders.

IX

CONCLUSION

We conclude that the Connecticut trial court in this case erred in failing to afford full faith and credit to the valid, final orders of another state. In so concluding, we highlight the significance of the full faith and credit clause, which, when applicable, serves the important function of "transforming an aggregation of independent, sovereign [s]tates into a nation." *Sherrer* v. *Sherrer*, 334 U.S. 343, 355, 68 S. Ct. 1087, 92 L. Ed. 1429 (1948). We therefore reverse in part the trial court's judgment and direct the trial court on remand to conduct a hearing on all financial issues, including the division of the marital assets, giving full faith and credit

K. S. *v.* R. S.

to the New Jersey court orders. We also reverse the trial court's granting of the plaintiff's motion for contempt.

The judgment of dissolution is reversed only with respect to the trial court's financial orders and the case is remanded for further proceedings in accordance with this opinion; the judgment of dissolution is affirmed in all other respects; the court's granting of the plaintiff's motion for contempt is reversed.

In this opinion the other justices concurred.